UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MATTHEW WILLIAM PARKER,

               Petitioner,                                    Case Number 15-11842
                                                                      Honorable David M. Lawson

v.

MARY BERGHUIS,

               Respondent,
_____/

## **OPINION AND ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS**

Petitioner Matthew William Parker was charged with three counts of sexually assaulting his step-niece between March 1999, when she was eight years old, and September 2003. An Oakland County, Michigan jury convicted him of two of those counts, which Parker challenges in a petition for a writ of habeas corpus under 28 U.S.C. § 2254. Parker's main contention is that neither the trial judge nor his defense attorney properly responded to a potentially deadlocked jury. He also believes that the trial judge misinstructed the jury on a key element of the crimes — first-degree criminal sexual conduct. However, the record does not show that Parker's convictions violate clearly established federal law or that the state courts misapplied controlling precedent. Therefore, the Court will deny the petition.

I.

Parker was charged with performing three acts of cunnilingus with his step-niece, Chelsea Hawley, beginning when she was eight years old. She testified that the abuse by Parker occurred "almost every day" over a four-year period of time, but she could not remember any specific dates for any of the incidents. She did not reveal her allegations until after she turned eighteen years old.

Chelsea lived with her father, Matthew Hawley, her mother, and her older sister, Brooke, in

their home in Troy, Michigan until 1996, when her mother passed away. Shortly thereafter, Matthew met Maureen Parker, the petitioner's twin sister, and they began dating. Maureen moved into Matthew's home eventually and they were married. Maureen and the petitioner were very close, and, beginning in 1999, the petitioner began spending much of his time at the Hawley home, even living there occasionally for short periods of time.

The petitioner was charged with three discrete incidents of criminal sexual conduct. However, Chelsea testified that she did not remember dates or specific details about the separate incidents. She acknowledged that she had to discuss with her father the dates that the petitioner was in the area before she went to the police to give her statements. Chelsea also admitted that much of what she told the detectives about these charges were just answers and guesses, and were not actual memories. She testified that the petitioner never asked her to perform any sex acts on him and he never had sexual intercourse with her. Chelsea also acknowledged that the petitioner never put any part of his body inside of her body.

The State alleged in count one that the first incident occurred when Chelsea was around eight years old. She was playing with her toys in the middle of the day in a hallway that was visible from the front door of her home. The petitioner approached her and took off her pants. Chelsea testified "my clothes were off and his mouth touched my private part." The petitioner told her that she "was supposed to like this" and that it was "supposed to feel good."

The second charged act — count two — happen when Chelsea was 8 or 9 years old. She testified: "I recall a time when it was at night, I was in my bedroom, and he came into my bedroom and performed oral sex, and my sister walked in and witnessed it." Chelsea testified that the petitioner's mouth touched her skin on her private part "where I pee out of." Chelsea's sister,

Brooke, testified that she entered Chelsea's room and witnessed the petitioner "with his head under the covers in her bedroom." Brooke testified that she "knew he [the petitioner] was licking her private parts" even though the petitioner's head was not visible. Chelsea said that her sister screamed when she came into the room, and then the petitioner followed Brooke out into the hallway where Chelsea heard them arguing. Chelsea's father (Matthew) and Maureen Parker were in their bedroom only a few feet away, but did not hear or see anything.

Brooke did not discuss the assault with Chelsea until some 10 years later. Brooke did not report this incident to her stepmother, aunts, grandparents, school counselors, or the therapists she was seeing. Brooke never told those people about the sexual abuse because she was afraid that Maureen would leave the family. Brooke acknowledged, however, that she hated Maureen, and that the two of them had been involved in many physical fights and verbal arguments. Brooke informed her father in 2004 that the petitioner was sexually abusing Chelsea, but he did not believe her and did nothing.

Chelsea testified that the third charged act (count three) occurred when she was 11 or 12 years old. Chelsea and the petitioner were in the basement where the petitioner was helping her make a musical instrument for a school project. Chelsea testified that the petitioner said "I know that you and your dad go to classes." Chelsea told him that she did not know what the petitioner was talking about. The petitioner replied "that he [Matthew] knew that I knew what was going on, but it was okay because that's — it feels good and it's okay for you to do this." When Chelsea told him she still did not know what he was talking about, the petitioner told her to go put on her pajamas. She testified "I went and got my pajamas on and he performed oral sex, his mouth touched my

private part. My skin." She said that she could not remember the part of the house where that incident occurred.

Chelsea did not report the sexual abuse to anyone until September of 2008 when she was eighteen years old, after she watched a television show about a young girl who had been sexually abused by her father. After watching the show, Chelsea told her friend, Allison Jackson, that the petitioner touched her inappropriately years earlier. Jackson testified that Chelsea did not appear to be upset and that she laughed it off; she did not provide any details about the incident.

A few weeks later, Chelsea told another friend, Kimberly Key, that something inappropriate had happened between her and the petitioner, but did not provide any details.

It was not until Marianne Carniak, Kimberly Key's mother, took Chelsea to the Troy, Michigan police department that Chelsea reported the abuse to the police. That occurred on February 18, 2009. Carniak had dated the petitioner on and off for about 10 years.

Chelsea admitted that much of what she told the detective in her interview was simply answers and guesses, and not the product of actual memories. She admitted discussing the details of her testimony with others. Chelsea had asked her father about the dates that the petitioner lived with them in the home. She asked Kim if she remembered when the petitioner had lived with her mother. It was with Carniak, however, that Chelsea discussed most of the details of her story. Chelsea testified that she and Carniak met "almost every day . . . so many times . . . really can't give you a number."

Each side called expert witnesses to give opinions on the behavior of children who are the victims of sexual abuse. The prosecution presented Sara Killips, who testified that delayed disclosure by such children is the norm, and that there is no typical length of time expected for

disclosure. The defense presented Dr. Ira Schaer, a licensed psychologist, who testified that, by the age of four or five, children generally understand the difference between a good touch and a bad touch. He said that an eight-year-old girl who encountered the behavior Chelsea attributed to her uncle would know that the conduct was inappropriate. He also testified that, as research had shown, because traumatic events are burned into a person's consciousness, he would expect that most 17-year-olds could report earlier sexual abuse in detail, as though it happened an hour earlier. Dr. Schaer also listed a catalog of behaviors typically displayed by sex abuse victims, none of which, according to several witnesses, Chelsea exhibited. Dr. Schaer described other inconsistencies between Chelsea's seemingly well-adjusted persona and that of the typical sex abuse victim. And he explained the concepts of suggestibility and false memory.

After the defense rested, and counsel presented their arguments, the court instructed the jury, which began its deliberations at 4:43 p.m. on February 24, 2010. Apparently the jury at some point reached an impasse, as the trial court file contains two notes from the jury. In one of them, the jury asked, "What do we do if we cannot agree on one or more of the counts?" Under that question, the trial judge scrawled this answer: "Please continue deliberations." Another communication from the trial judge on the same day says "Please continue your deliberations." It is unclear whether that note was responding to a different question by the jury, or was simply a reminder to the jurors to continue deliberating. The transcripts do not contain any reference to those notes at the time they occurred, and the notes were not read into the record in open court. On February 26, 2010, they were filed in the clerk's office.

On February 25, 2010, at 3:57 p.m., the jury indicated that they had reached a verdict. The jury foreperson announced a verdict of not guilty on count one and guilty on counts two and three. However, when the jury was polled, juror number 6 indicated that it was not her verdict:

THE CLERK: Juror in Seat Number 6, was that and is that your verdict?

JUROR NUMBER 6: No. I –

THE COURT: All right. Take the jury back.

(At 4:01 p.m., jury exits the courtroom).

After a bench conference, the trial judge proclaimed that she had complied with Michigan Court Rule 2.512 by sending the jury out for further deliberations. Defense counsel orally moved for a mistrial "under the circumstances that have just been displayed in this courtroom." In response to that motion, the trial judge stated:

> Thank you. Mich. Ct. Rules 2.512(B), as well as case law involving criminal matters, says that when one juror announces it is — the announced verdict is not hers or his, then the jury goes back into deliberations and the jury is continuing deliberations.

The trial court also clarified that the jury was instructed to keep deliberating sometime between 4:01 p.m. and 4:17 p.m.

At 4:33 p.m., the jury sent out a note indicating it had reached a verdict. The jury again acquitted the petitioner of count one (hallway allegations), and found him guilty of counts two and three (bedroom and basement allegations). When the jury was polled, all jurors indicated that they concurred in the verdict.

The petitioner was sentenced on April 8, 2010 to concurrent prison terms of 17.5 to 50 years. However, he did not submit a request for appointment of appellate counsel until September 3, 2010. The Michigan State Appellate Defender Office (SADO) was appointed on November 15, 2010 to

represent him, and filed a delayed application for leave to appeal in the Michigan Court of Appeals on April 8, 2011. The Michigan Court of Appeals issued a one-page order denying the application. *People v. Parker*, No. 306104 (Mich. Ct. App. Dec. 12, 2011). The court also denied the petitioner's motion to remand for an evidentiary hearing on jury coercion and ineffective assistance of trial counsel. The Michigan Supreme Court denied leave to appeal. *People v. Parker*, 491 Mich. 922, 812 N.W.2d 756 (Mich. 2012) (Table).

The petitioner filed a *pro se* petition for writ of habeas corpus on June 20, 2012. That petition was dismissed without prejudice at the petitioner's request so he could return to the state court to exhaust additional claims. *Parker v. Berghuis*, Case No. 12-12701 (E.D. Mich. Aug. 17, 2012). He then filed in a motion for relief from judgment in the Oakland County, Michigan circuit court. On April 5, 2013 the trial court issued an order denying the motion in part and ordering a response by the prosecution on one of the petitioner's claims. *People v. Parker*, No. 2009-227033-FC (Oakland Cty. Cir. Ct. Apr. 5, 2013). After the prosecutor responded, the trial court issued a second order denying the motion for relief from judgment on June 18, 2013. *People v. Parker,* No. 2009-227033-FC (Oakland Cty. Cir. Ct. June 18, 2013). The Michigan appellate courts denied the petitioner leave to appeal. *People v. Parker*, No. 319635 (Mich. Ct. App. Mar. 17, 2014), *lv. den.* 497 Mich. 903, 856 N.W.2d 15 (Mich. 2014) (Table).

On May 21, 2015, the petitioner filed the present petition for writ of habeas corpus, in which he asserts the following grounds:

> I. WHETHER PETITIONER PARKER WAS DENIED HIS CONSTITUTIONAL RIGHTS TO A FAIR TRIAL, AN IMPARTIAL JURY FREE FROM COERCION, AND THE EFFECTIVE ASSISTANCE OF COUNSEL WHERE THE JURY SENT A NOTE DURING DELIBERATIONS SUGGESTING IT WAS DEADLOCKED, AND LATER JUROR #6 REVEALED THAT THE ANNOUNCED VERDICT WAS NOT HER VERDICT, YET DEFENSE COUNSEL FAILED TO REQUEST,

AND THE TRIAL COURT FAILED TO GIVE, A DEADLOCK INSTRUCTION ON EITHER OCCASION. THE TOTALITY OF THE CIRCUMSTANCES CLEARLY SHOW THE STATE TRIAL COURT'S ACTIONS LED TO A COERCED JURY VERDICT, AND THE STATE APPELLATE COURTS' AFFIRMANCE OF PETITIONER'S CONVICTION WAS AN UNREASONABLE APPLICATION OF CLEARLY ESTABLISHED SUPREME COURT PRECEDENT.

II. WHETHER PETITIONER PARKER WAS DENIED HIS FEDERAL CONSTITUTIONAL RIGHTS TO DUE PROCESS OF LAW AND TO TRIAL BY JURY (U.S. CONST., AMENDS. VI, XIV) WHEN THE TRIAL COURT COMMITTED STRUCTURAL, PLAIN ERROR BY GIVING A MISLEADING AND INACCURATE INSTRUCTION TO THE JURY ON THE KEY ELEMENT OF THE OFFENSE CHARGED; BY ALLOWING PETITIONER'S CONVICTION TO STAND THE STATE COURTS UNREASONABLY APPLIED CLEAR UNITED STATES SUPREME COURT PRECEDENT.

Pet. at iv. The warden opposes the petition on the merits, and also raises certain procedural defenses, which need not be addressed here. *See Hudson v. Jones*, 351 F. 3d 212, 215 (6th Cir. 2003) (holding that "federal courts are not required to address a procedural-default issue before deciding against the petitioner on the merits") (citing *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997)).

II.

The provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214 (Apr. 24, 1996), which govern this case, "circumscribe[d]" the standard of review federal courts must apply when considering an application for a writ of habeas corpus raising constitutional claims, including claims of ineffective assistance of counsel. *See Wiggins v. Smith*, 539 U.S. 510, 520 (2003). Because Parker filed his petition after the AEDPA's effective date, its standard of review applies. Under that statute, if a claim was adjudicated on the merits in state court, a federal court may grant relief only if the state court's adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established

Federal law, as determined by the Supreme Court of the United States," or if the adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)-(2). "Clearly established Federal law for purposes of § 2254(d)(1) includes only the holdings, as opposed to the *dicta*, of [the Supreme] Court's decisions." *White v. Woodall*, 572 U.S. 415, ---, 134 S. Ct. 1697, 1702 (2014) (internal quotation marks and citations omitted). "As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011).

The distinction between mere error and an objectively unreasonable application of Supreme Court precedent creates a substantially higher threshold for obtaining relief than *de novo* review. The AEDPA thus imposes a highly deferential standard for evaluating state-court rulings, and demands that state-court decisions be "given the benefit of the doubt." *Renico v. Lett*, 559 U.S. 766, 773 (2010) (finding that the state court's rapid declaration of a mistrial on grounds of jury deadlock was not unreasonable even where "the jury only deliberated for four hours, its notes were arguably ambiguous, the trial judge's initial question to the foreperson was imprecise, and the judge neither asked for elaboration of the foreperson's answers nor took any other measures to confirm the foreperson's prediction that a unanimous verdict would not be reached" (internal quotation marks and citations omitted)); *see also Leonard v. Warden, Ohio State Penitentiary*, 846 F.3d 832, 841 (6th Cir. 2017); *Dewald v. Wriggelsworth*, 748 F.3d 295, 298-99 (6th Cir. 2014); *Bray v. Andrews*, 640 F.3d 731, 737-39 (6th Cir. 2011); *Phillips v. Bradshaw*, 607 F.3d 199, 205 (6th Cir. 2010); *Murphy*

*v. Ohio*, 551 F.3d 485, 493-94 (6th Cir. 2009); *Rockwell v. Yukins*, 341 F.3d 507, 511 (6th Cir. 2003) (en banc). Moreover, habeas review is "limited to the record that was before the state court." *Cullen v. Pinholster*, 563 U.S. 170, 180 (2011).

Even though the state appellate courts did not give full consideration to the petitioner's federal claims on appeal, AEDPA's highly deferential standard for reviewing a habeas petitioner's constitutional claims applies here. The petitioner must show that "the state court decision was 'contrary to, or involved an unreasonable application of, clearly established Federal law' or involved an 'unreasonable determination of the facts.'" *Kelly v. Lazaroff*, 846 F.3d 819, 831 (6th Cir. 2017) (quoting 28 U.S.C. § 2254(d)). That standard applies "even when a state court does not explain the reasoning behind its denial of relief." *Carter v. Mitchell*, 829 F.3d 455, 468 (6th Cir. 2016). "Under [*Harrington v. Richter*, 562 U.S. 86 (2011)], '[w]hen a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on its merits in the absence of any indication or state-law procedural principles to the contrary.'" *Barton v. Warden, S. Ohio Corr. Facility*, 786 F.3d 450, 460 (6th Cir. 2015) (quoting *Harrington*, 562 U.S. at 99). There is nothing in this record that suggests a basis for rebutting that presumption. *See Johnson v. Williams*, 568 U.S. 289, 133 S. Ct. 1088, 1097 (2013).

A.

The petitioner's main argument focuses on how the trial judge responded first to a jury question about a potential deadlock, and then when the jury was polled in open court after announcing its verdict and one juror did not indicate agreement. The petitioner believes that the judge's curt response, coupled with the trial judge's frequent display of incivility to counsel during the trial, created an atmosphere of coercion in which the jurors felt compelled to surrender their own

-10-

honest opinions just to return a unanimous verdict. In neither instance did the trial judge give what might be viewed as a typical deadlocked jury instruction, which commonly includes an instruction for jurors "to rethink [their] own views and change [their] opinion if you decide it was wrong," and also guard against "giv[ing] up [their] honest beliefs about the weight or effect of the evidence only because of what your fellow jurors think or only for the sake of reaching agreement." *See* Mich. Crim. Jury Inst § 3.12; *see also* Sixth Circuit Pattern Jury Inst. 9.04; *United States v. Clinton*, 338 F.3d 483, 488 (6th Cir. 2003).

Supplemental charges for deadlocked juries have been expressly approved by the Supreme Court. *See Allen v. United States*, 164 U.S. 492, 501 (1896). When a habeas petitioner alleges that a court deviated from an approved *Allen* charge, the inquiry is whether "'in its context and under all the circumstances' the *Allen* charge was 'coercive.'" *Williams v. Parke*, 741 F.2d 847, 850 (6th Cir. 1984) (quoting *Jenkins v. United States*, 380 U.S. 445, 446 (1965)).

In this case, the trial judge adopted a minimalist approach, neither telling the jury that it must reach a verdict, nor cautioning individual jurors to guard against surrendering their honest beliefs. Certainly, an instruction that appears to give a jury no choice but to return a verdict is impermissibly coercive. *See Jenkins v. United States*, 380 U.S. 445, 446 (1965) (per curiam). In *Jenkins*, after about two hours of deliberation, the jury sent a note informing the district judge that it was deadlocked. The district judge called the jury into the courtroom and "in the course of his response stated that 'You have got to reach a decision in this case.'" *Ibid.* The Supreme Court found the instruction to constitute plain error and reversed and remanded the case for a new trial. *Ibid.*; *see also Brasfield v. United States*, 272 U.S. 448, 450 (1926) (concluding that an inquiry into how the jury is divided is unduly coercive). The court here simply told the jury to "continue

deliberating." The court set no time limits, did not threaten continued service, and did not suggest the prospect of sequestration. The jury had been deliberating for less than a day at the time. The state court's presumed decision that the trial judge's conduct did not amount to coercion does not contravene or misapply Supreme Court precedent.

Nor did the trial judge violate clearly established federal law when she sent the jury back to deliberate when the polling suggested a lack of unanimity in the jury's verdict. The judge did not inquire about the jury's numerical division, and she did not comment on the apparent holdout's position. Instead, she applied by rote Michigan Court Rule 6.420(D), which states:

> If polling discloses the jurors are not in agreement, the court may (1) discontinue the poll and order the jury to retire for further deliberations, or (2) either (a) with the defendant's consent, or (b) after determining that the jury is deadlocked or that some other manifest necessity exists, declare a mistrial and discharge the jury to determine if the verdict is unanimous.

> That rule is similar to its federal counterpart, which states:

> After a verdict is returned but before the jury is discharged, the court must on a party's request, or may on its own, poll the jurors individually. If the poll reveals a lack of unanimity, the court may direct the jury to deliberate further or may declare a mistrial and discharge the jury.

Fed. R. Crim. P. 31(d).

In *Lyell v. Renico,* 470 F. 3d 1177, 1183-85 (6th Cir. 2006), the Sixth Circuit held that the state trial court did not coerce the jury into reaching a guilty verdict by completing the jury poll after one juror indicated that her verdict was not guilty, and then sending the jurors back to deliberate further. In *Lyell*, the court observed that "there is a world of difference between juror-coercion claims arising from deadlocked juries and those arising from post-verdict juror polling." *Id.* at 1183. Coercion does not result when polling reveals that unanimity cannot be achieved because of a single holdout. Suggesting the contrary conclusion, the court noted that the prospect that a juror "who

-12-

retained the courage of her convictions to tell the public that she now wanted to change her vote, would be browbeaten into submitting to the majority . . . seems quite slim." *Id.* at 1184. In this case, the fact that the judge sent the jurors back to deliberate after discovering that Juror Number 6 did not agree with the verdict likewise does not establish coercion that undermined the petitoner's due process rights.

Finally, a trial court's failure to include a reminder that jurors should not abandon their honest convictions or beliefs, in response to the jury's indication of possible deadlock, "is not invariably fatal to the conviction." *See Bedford v. Collins,* 567 F. 3d 225, 238 (6th Cir. 2009). The trial judge in her initial charge to the jury had instructed them that "none of you should give up your honest opinion about the case just because other jurors disagree with you or just for the sake of reaching a verdict." Although prudence may have suggested repeating that caveat when the prospect of deadlock loomed, the failure to repeat the admonition did not violate any clearly established right. Even if this Court agreed with the petitioner's argument that there may have been some jury coercion, "it is at least reasonable to conclude that there was not, which means that the state court's determination to that effect must stand." *Early v. Packer*, 537 U.S. 3, 11 (2002).

B.

The petitioner next argues that he was denied the effective assistance of counsel because his trial attorneys did not ask for a supplemental jury instruction — perhaps the Michigan pattern instruction on deadlocked juries — when presented with the jury poll results in open court. That argument is a nonstarter. Instead of asking for further instructions, counsel moved for a mistrial, which certainly is a common strategic response in similar circumstances.

A violation of the Sixth Amendment right to effective assistance of counsel is established when an attorney's performance was deficient and the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). An attorney's performance is deficient if "counsel's representation fell below an objective standard of reasonableness." *Id.* at 688. The petitioner must show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687. "Judicial scrutiny of counsel's performance must be highly deferential." *Id.* at 689. The Supreme Court has "declined to articulate specific guidelines for appropriate attorney conduct and instead [has] emphasized that the proper measure of attorney performance remains simply reasonableness under prevailing professional norms." *Wiggins*, 539 U.S. at 521 (quoting *Strickland*, 466 U.S. at 688) (quotation marks omitted).

An attorney's deficient performance is prejudicial if "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687. The petitioner must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. Unless the petitioner demonstrates both deficient performance and prejudice, "it cannot be said that the conviction resulted from a breakdown in the adversary process that renders the result unreliable." *Id.* at 687.

Success on ineffective-assistance-of-counsel claims is relatively rare, because the standard for obtaining habeas corpus relief "is 'difficult to meet.'" *Woodall*, 134 S.Ct. at 1702 (quoting *Metrish v. Lancaster*, 569 U.S. 351, 358 (2013) (quoting *Richter*, 562 U.S. at 102)). The standard is "all the more difficult" on habeas corpus review because "[t]he standards created by *Strickland*

and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so." *Richter*, 562 U.S. at 105 (citations and quotation marks omitted). "[T]he question is not whether counsel's actions were reasonable," but "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Ibid.*

Defense counsel's decision to seek a mistrial rather than to request the deadlocked jury instruction is a valid tactical choice that defeats the petitioner's ineffective assistance of counsel claim. *Cf. United States v. Burke*, 257 F.3d 1321, 1323-24 (11th Cir. 2001) (defense attorney's tactical decision not to seek mistrial but instead to request *Allen* charge, against defendant's wishes, did not constitute *per se* ineffective assistance of counsel). Where two reasonable but divergent paths are presented, reviewing courts studiously avoid second-guessing counsel's choices. In fact, *Strickland* requires a reviewing court to presume that defense counsel's conduct was not the product of deficient performance. "To counteract the natural tendency to fault an unsuccessful defense, a court reviewing an ineffective assistance of counsel claim must 'indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" *Nix v. Whiteside*, 475 U.S. 157, 165 (1986) (quoting *Strickland*, 466 U.S. at 689); *see also Griffin v. McVicar*, 84 F.3d 880, 888 (7th Cir. 1996) ("[T]he mere fact that a defendant chooses one of two available defenses cannot establish ineffective assistance of counsel, even if the defendant makes a bad choice."). A habeas court not only must give defense counsel the benefit of the doubt, but must also affirmatively entertain the range of possible reasons that counsel may have had for proceeding as he did. *Cullen,* 563 U.S. at 196.

C.

The petitioner contends that the trial court erred by improperly instructing the jury on the elements of first-degree criminal sexual conduct. He says that the judge committed structural error when she failed to tell the jury that an actual "penetration" was necessary to convict the petitioner of this crime.

An erroneous jury instruction warrants habeas corpus relief only where the instruction "'so infected the entire trial that the resulting conviction violates due process.'" *Estelle v. McGuire*, 502 U.S. 62, 72 (1991) (quoting *Cupp v. Naughten*, 414 U.S. 141, 147 (1973)). The challenged jury instruction "'may not be judged in artificial isolation,' but must be considered in the context of the instructions as a whole and the trial record." *Ibid.* (quoting *Cupp*, 414 U.S. at 147). The Court must "inquire 'whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way' that violates the Constitution." *Ibid.* (quoting *Boyde v. California*, 494 U.S. 370, 380 (1990)).

The petitioner criticizes the jury instruction in this case not because of what the court said, but because of what it omitted. However, the Sixth Circuit has held that "an instruction that omits an element of the offense does not *necessarily* render a criminal trial fundamentally unfair or an unreliable vehicle for determining guilt or innocence." *Patterson v. Haskins*, 316 F.3d 596, 609 (6th Cir. 2003) (quoting *Neder v. United States*, 527 U.S. 1, 9 (1999)). The Supreme Court has observed that "[a]n omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law." *Henderson v. Kibbe*, 431 U.S. 145, 155 (1977).

Michigan law defines the crime of first-degree criminal sexual conduct as the act of sexual penetration under the circumstances delineated by the statute, including acts with a person under

thirteen years of age. Mich. Comp. Laws § 750.520b(1)(a). Section 750.520a(o) defines "sexual penetration" as "sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of another person's body, but emission of semen is not required." *See Greenwell v. Elo*, 77 F. App'x 790, 792 (6th Cir. 2003) (citing Mich. Comp. Laws § 750.520a(1)). Under Michigan law, an act of cunnilingus is considered to be sexual penetration even where the oral contact does not include actual invasion of the vaginal cavity. *See People v. Legg*, 197 Mich. App 131, 133, 494 N.W. 2d 797 (1992). Therefore, if cunnilingus is performed, there is "no requirement" "that there be something additional in the way of penetration" for the element of sexual penetration to be established under section 750.520b(1). *People v. Harris*, 158 Mich. App. 463, 470, 404 N.W.2d 779 (1987).

The trial judge both before and after trial instructed the jury that they were required to find that cunnilingus was performed upon the victim before it could convict the petitioner of first-degree criminal sexual conduct. Michigan law does not require a finding of an additional act of "sexual penetration" separate from cunnilingus to convict a defendant of first-degree criminal sexual conduct. Therefore, even though the trial court did not define penetration, its instructions did not permit the jury to convict the petitioner of first-degree criminal sexual conduct without finding all the essential elements of the offense.

## III.

The state courts' decisions in this case were not contrary to federal law, an unreasonable application of federal law, or an unreasonable determination of the facts. The petitioner has not

established that he is presently in custody in violation of the Constitution or laws of the United States.

Accordingly, it is **ORDERED** that the petition for a writ of habeas corpus is **DENIED.**

                                          s/David M. Lawson
                                          DAVID M. LAWSON
                                          United States District Judge

Dated: August 2, 2018

---

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on August 2, 2018.

                          s/Susan Pinkowski
                          SUSAN PINKOWSKI